# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

WEIGHT LOSS HEALTHCARE )
CENTERS OF AMERICA, INC., )
                                           )
          **Plaintiff,**     )
                                           )
v.                                          )
                                           )     No. 09-2468-CM-JPO
                                           )
OFFICE OF PERSONNEL          )
MANAGEMENT,                    )
                                           )
          **Defendant.**    )
                                           )

## MEMORANDUM AND ORDER

Plaintiff Weight Loss Healthcare Centers of America, Inc., seeks judicial review of the administrative denial of insurance benefits to one of plaintiff's patients by the defendant, Office of Personnel Management ("OPM"). Plaintiff has submitted its Brief in Support of Administrative Appeal (Doc. 25), and defendant has submitted its Brief in Support of Agency Action (Doc. 27). Also before the court is Defendant's Motion to Strike Exhibits with Memorandum in Support Included (Doc. 26). The court has reviewed the administrative record and the briefs filed in accord with Local Rule 83.7.1(d) and is prepared to rule. For the reasons that follow, the court grants defendant's motion to strike, and affirms defendant's administrative decision.

**I.**     **Factual and Procedural Background**

Defendant contracts with qualified insurance carriers for federal employee health benefit plans, including the Service Benefit Plan ("Plan"), pursuant to 5 U.S.C. § 8902. Blue Cross Blue Shield Association ("BCBSA") is the insurance carrier for the Plan, and administers the Plan nationally through its local member insurers, including Blue Cross Blue Shield of Kansas City

("BCBSKC").

At all relevant times, Eric Walters was a federal employee who had health insurance through the Plan. Mr. Walters was enrolled in the "Standard Option" under the Plan, for which he paid a higher premium than the "Basic Option."

In late 2007, Walters sought medical care from plaintiff, consisting of a gastric-banding procedure intended to help him control his weight.

Plaintiff is an out-of-network provider with respect to BCBSKC, meaning it does not contract with the insurer for particular reimbursement rates.

Plaintiff requested pre-authorization of Walters' gastric-banding procedure from BCBSKC; BCBSKC sent plaintiff a letter indicating that BCBSKC would make payment under the terms of the patient's insurance policy. (OPM00034–35; Doc. 25, at 3; Doc. 27, at 7.)

The Plan states that BCBSA will pay 70 percent of the "plan allowance" for out-of-network, outpatient services. The plan allowance is defined as "the average for outpatient surgical services that [BCBSA] pay[s] nationally to contracting and non-contracting facilities." (OPM000217.)

Plaintiff performed the gastric-banding procedure on Walters, and billed Walters and BCBSKC $56,000.00 for hospital services.

BCBSA, through BCBSKC, paid plaintiff $1,610 (70 percent of a $2,300 plan allowance) for the gastric-banding procedure and Walters remained responsible to plaintiff for the balance of bill: $54,390.

On or about August 12, 2008, Walters requested reconsideration of the partial denial of benefits. Specifically, Walters requested a copy of the formula used to calculate the $2,300 plan allowance.

BCBSKC responded on August 25, 2008, stating "[d]ue to the fact that the [p]lan allowance is calculated on a national level, including all Blue Cross and Blue Shield Plan Plans [sic], the specific calculations you are requesting are not available to [BCBSKC] individually." BCBSKC advised that it had forwarded plaintiff's claim to the Federal Employee Program national claims processing center, which had "advised that the national average for outpatient services that we pay nationally in contracting and non-contracting facilities is $2300.00" (OPM00026.)

Walters executed an authorization and consent giving plaintiff the authority to represent him in an appeal of his partial benefit denial. (OPM00032, 93.)

Plaintiff submitted a formal Request for Reconsideration on September 29, 2008. BCBSKC affirmed the denial on reconsideration, referring plaintiff again to the language of the plan and noting that the plan "allowance is determined by calculating the national average paid for outpatient surgery for a twelve month period," and that the "calculation includes all outpatient surgical claims for services performed and is set annually on behalf of all [BCBS] Plans for the upcoming benefit year." BCBSKC noted that the Federal Employee Program Management and Claims Review Specialists reviewed plaintiff's claim and confirmed that the claim was processed correctly according to the Plan and based upon the applicable plan allowance. (OPM00030–31.)

On subsequent appeal, defendant affirmed the denial of plaintiff's claim, determining that the Plan processed the claim correctly, and that the claim was paid in compliance with the benefits stated in the Plan brochure. (OPM00094–95.)

Plaintiff then tendered a request under the Freedom of Information Act ("FOIA"), 5 U.S.C § 552, to defendant, seeking information regarding the calculation used to determine the average amount that BCBSA pays nationally to contracting and non-contracting facilities for outpatient surgical services.

Plaintiff filed a two-count complaint on September 8, 2009, seeking review of the administrative denial of insurance benefits, and judicial review of defendant's denial of certain of plaintiff's FOIA requests. The FOIA claim was dismissed without prejudice, and is not currently pending before the court.

Plaintiff has submitted its Brief in Support of Administrative Appeal (Doc. 25), and defendant has filed its Brief in Support of Agency Action (Doc. 27). In plaintiff's brief, plaintiff included seven exhibits that were not part of the administrative record upon which defendant based its decision.[1] On that basis, defendant moves the court to strike them. The exhibits are referenced in nine of the sixty-two paragraphs comprising plaintiff's statements of fact, and the exhibits support one of plaintiff's five substantive arguments. Specifically, they support an argument not previously presented to defendant: that "the Service Benefit Plan Apparently Relied on the Fraudulent Ingenix

---

[1] The challenged exhibits include: (1) the written statement of Stephen W. Gammarino, Senior Vice President, National Programs, Blue Cross and Blue Shield Association, entitled "2009 Blue Cross Blue Shield Health Benefit: What it Means for Federal Employees," before the House Committee on Oversight and Government Reform, December 3, 2008 (Doc. 25-1); (2) a letter dated March 31, 2009, from Sen. John D. Rockefeller IV, Chairman of the Committee on Commerce, Science, and Transportation, to Hon. Patrick E. McFarland, Inspector General, Office of Personnel Management, expressing concern about FEHBP members' reimbursements based on a New York Attorney General's investigation into a database product called Ingenix, and requesting that the Inspector General gather certain information to assist the Committee in understanding how the use of Ingenix data has impacted federal employees (Doc. 25-2); (3) Staff Report for Chairman Rockefeller entitled "Underpayments to Consumers by the Health Insurance Industry," dated June 24, 2009, in which committee staff determine that "in every region of the United States, large health insurance companies have been using two faulty database products owned by Ingenix, Inc., to under-pay millions of valid insurance claims" (Doc. 25-3); (4) an undated document listing local Blue Cross and Blue Shield companies, including Blue Cross and Blue Shield of Kansas (Doc. 25-4); (5) an undated document that appears to be a captured webpage image (Doc. 24-5); (6) a document dated January 13, 2009, entitled "Health Care Report: The Consumer Reimbursement System is Code Blue" prepared by the Healthcare Industry Taskforce of the State of New York Office of the Attorney General, suggesting that the schedules compiled by Ingenix, which itself is a wholly-owned subsidiary of UnitedHealth Group Incorporated, a large national health insurer, "are unreliable, inadequate, and wrong" (Doc. 25-6); (7) the declaration of Christopher Wilson, a member of plaintiff's counsel, certifying that each of the exhibits is a true and correct copy of what it purports to be (Doc. 25-7).

Database." (Doc. 25, at 17–20.)

## II. Motion to Strike

Defendant argues that judicial review of an administrative decision is limited to the administrative record that was before the agency when that decision was rendered. It argues also that plaintiff may not attack the administrative decision for a reason not raised during the administrative proceedings.

Title 5, § 890.107 of the Code of Federal Regulations governs judicial review of final actions of the Office of Personnel Management. Because Congress has not provided otherwise in that statute, the Administrative Procedure Act ("APA," 5 U.S.C. §§ 500-706) applies. *Bryan v. Office of Personnel Mgmt.*, 165 F.3d 1315, 1318–19 (10th Cir. 1999).

Judicial review of an administrative decision should normally be limited to the record before the agency when that decision was rendered. *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Am. Mining Cong. v. Thomas*, 772 F.2d 617, 626 (10th Cir. 1985). Although the Tenth Circuit has recognized that in "extremely limited" circumstances a court might look outside the administrative record on judicial review, *id.*, the court agrees with defendant that none of these "extremely limited" circumstances exist in this case, *see Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007). The general rule against looking outside the administrative record applies to this appeal.

The court determines that it will not consider the challenged exhibits because, notwithstanding the general rule set out above, there are specific regulations limiting this court's review of decisions by the Office of Personnel Management. In this case, the Federal Employees Health Benefits Act ("Benefits Act"), 5 U.S.C. §§ 8901 through 8914, governs plaintiff's claim. The regulations accompanying the Benefits Act set out the remedies a covered individual must seek

-5-

before it may seek judicial review of defendant's final action. 5 C.F.R. § 890.107(c) and (d); *see, e.g.*, 5 C.F.R. § 890.105(a)(1) (delegating authority to resolve benefit claims to the health benefit carrier, setting out how to seek reconsideration by the carrier); 5 C.F.R. § 890.105(b)(3) (setting out procedure for seeking review by defendant). And the regulations limit the role of the courts in a benefits dispute by mandating that judicial review of defendant's action is "limited to the record that was before [defendant] when it rendered its decision affirming the carrier's denial of benefits." 5 C.F.R. § 890.107(d)(3).

The court reaches the same conclusion—that the exhibits are not properly considered in this appeal—under the general rule that a party cannot ordinarily raise an issue for the first time on judicial review of an administrative decision. A party must generally have called the issue to the agency's attention in order to give the agency an opportunity to consider it fully, and if the issue is not raised before the agency, it is waived unless that issue was "obvious." *Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 764 (2004). Plaintiff did not argue during the administrative proceedings that BCBSA, BCBSKC, or defendant relied on the Ingenix Database or that that database had been fraudulently manipulated. Thus, the issue is not properly raised for the first time on judicial review of that administrative decision.

Plaintiff's suggestion that the court can take judicial notice of the offered exhibits is unconvincing: the evidentiary doctrine for taking notice of adjudicative facts does not apply to the circumstances of this case or these particular exhibits, and does not override the congressional directive that this court consider only the record that was before defendant when it rendered its decision. *See* Fed. R. Evid. 201.

The court has carefully considered plaintiff's alternative argument for remand. Plaintiff suggests that remand is appropriate so that defendant can consider and determine, given the newly

offered exhibits and arguments, whether and how the Ingenix database was instrumental in determining the plan allowance in this case, and whether that calculation was manipulated or flawed. It appears to the court that this is a different dispute than the one originally brought before defendant, decided by defendant, and contested on appeal to this court. The dispute at issue in this appeal involves the interpretation of the term "plan allowance," defined as "the average for outpatient surgical services that [BCBSA] pay[s] nationally to contracting and non-contracting facilities." BCBSA and defendant interpreted this language to require that BCBSA pay 70 percent of the average *for all outpatient surgical services* that it pays nationally. Plaintiff argued that BCBSA was required by that language to pay 70 percent of the average amount it pays *for outpatient gastric-banding surgical services*. (Doc. 1, at 1.) And that BCBSA failed to provide the "specific and detailed reasons for the denial" required by 5 C.F.R. § 890.105(d)(1).

Defendant issued its final decision determining that the claim was correctly processed, and plaintiff appealed that decision by filing its complaint. Only now does plaintiff suggest that the figure may have been faulty because it may have been drawn from an allegedly flawed database. Defendant may, "upon its own motion . . . reopen its review [of a case] if it receives evidence that was unavailable at the time of its original decision." 5 C.F.R. § 890.105(e)(5). But defendant has not done so, and this court is guided by a strong line of caselaw "loath to require that factfinding begin anew." *Bowman Transp., Inc., v. Arkansas-Best Freight Syst.*, 419 U.S. 281, 294–95 (1974). The court declines to remand this matter for consideration of the newly-raised argument and "supporting" documentation, which is only tangentially related, if related at all, to the merits of this appeal.

For these reasons, the court grants defendant's motion to strike. The court does not consider (1) those portions of plaintiff's statement of facts relying on the stricken exhibits (Doc. 25, ¶¶ 6, 51,

54–60); (2) the substantive argument contained in its brief that "The Service Benefit Plan Apparently Relied on the Fraudulent Ingenix Database" (Doc. 25, at 17–20); or (3) the final instruction prayed for in plaintiff's claim for relief (Doc. 25, at 26).

## III.     Standard of Review for Administrative Appeal

The parties dispute the amount of deference this court gives to the agency's decision. Plaintiff asserts that although defendant's factual findings and interpretation of its own regulations are reviewed with deference, defendant's ultimate decision—based on the common law principles of contract interpretation—is entitled to no deference. *Compare* 5 U.S.C. § 706(2)(A) (under the APA, a court may set aside an agency's final actions only if they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.") *with Jicarilla Apache Tribe v. Fed. Energy Regulatory Comm'n*, 578 F.2d 289, 292–93 (10th Cir. 1978) (where an agency's decision "is not based on expertise in the particular field . . . but is based on general common law principles," it is not entitled to deference).

The Benefits Act, 5 U.S.C. §§ 8901–8914, directs OPM to contract with private insurance carriers or employee organizations to provide health benefits. And the Act authorizes the OPM to determine what "maximums, limitations, exclusions, and other definitions of benefits" will be included in each contract. 5 U.S.C. § 8902(d). To ensure uniformity in the administration of benefits under the Benefits Act (and thus control costs), § 8902(m)(1) mandates that once the OPM enters into a benefits contract, that contract has the preemptive force of federal law. 5 U.S.C. § 8902(m)(1); *Hayes v. Prudential Ins. Co.*, 819 F.2d 921, 926 (9th Cir. 1987), *cert. denied* 484 U.S. 1060 (1988). In addition, each contracting carrier must abide by the OPM's decisions regarding coverage, 5 U.S.C. § 8902(j), and each claimant whose claim has been denied by a contracting carrier must appeal to the OPM before proceeding with a civil suit. 5 C.F.R. § 890.105 (1992);

*Bryan*, 165 F.3d at 1318; *Nesseim v. Mail Handlers Ben. Plan*, 995 F.2d 804, 806–07 (8th Cir. 1993); *Kobleur v. Group Hosp. & Med. Servs.*, 954 F.2d 705, 711 (11th Cir. 1992); *see also Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 593–94 (2d Cir. 1993).

Congress delegated authority to OPM to regulate the field in which it negotiates insurance contracts and administers federal benefits. And OPM has special expertise in contracting and in reviewing health benefits disputes under its contracts. For this reason, and in accord with relevant caselaw, this court agrees with defendant that review of OPM's interpretation is under the arbitrary or capricious standard. *See Nesseim*, 995 F.2d at 806–07 (reversing district court's de novo review of OPM decision regarding whether certain treatment was covered under the applicable plan, reviewing under the arbitrary and capricious standard); *Gilchrist v. National Ass'n of Letter Carriers*, No. 99-4056, 1999 WL 1246916, at *2 (10th Cir. Dec. 23, 1999) (reviewing OPM's final decision regarding whether a particular facility was a "hospital" as defined by the applicable plan under the arbitrary and capricious standard); *Nw. Pipeline Corp. v. Fed. Energy Regulatory Comm'n*, 61 F.3d 1479, 1486 (10th Cir. 1995) (deferring to agency's interpretation of contract provided interpretation had ample factual and legal support); *see also Caudill v. Blue Cross & Blue Shield of N. Car.*, 999 F.2d 74, 80 (4th Cir. 1993) (abrogated on other grounds by *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677 (2006)); *Muratore v. U.S. Office of Personnel Mgmt.*, 222 F.3d 918, 920–23 (11th Cir. 2000); *Gates v. King*, No. 96-2710, 1997 WL 716426, at *1–2 (4th Cir. Nov. 18, 1997); *see generally Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 843–45 (1984) (holding that, where Congress has entrusted a department to administer a statutory scheme, review of agency action is entitled to deference even on pure questions of law).

The APA permits this court to set aside defendant's final actions only if they were "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with the law." *Bryan*, 165 F.3d at 1318–19 (quoting 5 U.S.C. § 706(2)(A)). In other words, the court must uphold the agency's action if it has articulated a rational basis for the decision and has considered relevant factors. *Colo. Dep't of Soc. Servs. v. U.S. Dep't of Health & Human Servs.*, 29 F.3d 519, 522 (10th Cir. 1994) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). While a reviewing court makes a "searching and careful" inquiry into the facts, the court will not merely substitute its judgment for that of the agency. *Foust v. Lujan*, 942 F.2d 712, 714 (10th Cir. 1991) (quotations omitted.)

Because the arbitrary and capricious standard focuses on the rationality of an agency's decision-making process rather than on the rationality of the actual decision, "it is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs.*, 463 U.S. at 50. Thus, the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record. *Am. Petroleum Inst. v. Envtl. Prot. Agency*, 540 F.2d 1023, 1029 (10th Cir. 1976) (construing *Motor Vehicle Mfrs*.). Judicial review focuses on the administrative record existing before the agency, *Camp*, 411 U.S. at 142, and an agency's action will not be sustained unless it is supported by substantial evidence. *Olenhouse v. Commod. Credit. Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994); *Logan Farms, Inc. v. Espy*, 886 F. Supp. 781, 786–87 (D. Kan. 1995).

**IV.    Analysis**

Plaintiff claims that (1) the definition of the "plan allowance" is ambiguous and should therefore be interpreted in favor of the insured's reasonable expectations; (2) defendant's interpretation of the definition of the "plan allowance" is unreasonable, illogical, and runs counter to congressional intent; (3) defendant approved of BCBS's failure to provide the mandated specific and

detailed reasons for the denial of plaintiff's claim; and (4) OPM made its decision based on an uninformed record, that is, a record that lacked, *inter alia*, the plan allowance calculation.

After carefully considering the briefs submitted by the parties in accord with Local Rule 83.7.1(d), and the administrative record presented here, the court rules as follows.

**Plan is not Ambiguous**

There is no dispute that plaintiff's claim is for a non-emergency outpatient surgery and that plaintiff is an out-of-network provider with respect to BCBSKC, meaning it does not contract with the insurer for particular reimbursement rates. The 2008 Blue Cross Blue Shield Benefit Plan under which Mr. Walters was insured states that, for out-of-network, outpatient services, the insured is responsible for paying 30 percent of the "plan allowance," plus any difference between the plan allowance and the billed amount. (OPM000165.) In other words, BCBS will pay 70 percent of the plan allowance for out-of-network, outpatient services. (*See* OPM000165; OPM000181.) In defining "plan allowance," the Plan provides that, "for outpatient, non-emergency surgical services at hospitals and other facilities that do not contract with your local Blue Cross and Blue Shield Plan . . . our allowance is the average amount for outpatient surgical services that we pay nationally to contracting and non-contracting facilities." (OPM000217.)

Plaintiff argues that a reasonable person would interpret this language to set a plan allowance as the average amount for outpatient surgical services *of the same type*, not of all outpatient surgical services. The language of the Plan does not support plaintiff's interpretation. On the contrary, the Plan draws a clear distinction between other types of claims—inpatient services and health care professional claims—that are paid based on "the type of admission" or "the service or supply"; and on outpatient, non-emergency surgical services. As OPM notes, the paragraphs containing these distinctions appear together within the Plan. The court agrees with OPM that the Plan is not

ambiguous.

### Interpretation is not Unreasonable

For the same reasons, the court finds that OPM's interpretation is not unreasonable, illogical, or contrary to congressional intent. Although plaintiff (and Mr. Walters) may have believed that reimbursement would be based on the national average paid for gastric-banding procedures rather than the national average for all outpatient surgical services, such a belief is not justified by the Plan, and the argument provides no basis for overturning OPM's decision.

The court is sensitive to plaintiff's argument that "no rational insured" would expect to be responsible for $54,390 out of a $56,000 charge. As a practical matter, such a bill, if unexpected, would certainly be an unwelcome surprise. But as OPM notes, the Plan language attempts to prevent such "surprises" by alerting the insured of such possibilities. The Plan places the insured on notice that he or she alone is responsible for paying non-participating providers (OPM000105); that out-of-pocket costs may be substantially higher when using non-participating providers (OPM000105); that non-participating providers have no agreement to limit what they may bill, and that the insured is responsible for paying any difference between the Plan allowance and the amount charged by the non-participating provider (OPM000116–17). It appears that, to the extent the plan allowance for plaintiff's procedure is set annually on behalf of all BCBS Plans for the upcoming benefit year, (OPM00030–31), plaintiff could have discovered the plan allowance figure of $2,300. In any case, the court cannot agree that a rational insured, given the language of the Plan, would expect greater benefits to be available for a non-emergency, outpatient surgical service by an out-of-network provider.

Plaintiff suggests that OPM's interpretation runs counter to 5 U.S.C. § 8902(i) (directing that rates charged under health benefit plans should reflect the cost of the benefits provided). In

support, plaintiff argues that Mr. Walters chose the Standard Option of the plan rather than the slightly lower proceed Basic Option on the basis that the higher cost plan would entitle him to improved accessibility and affordability of out-of-network care. As OPM notes, this argument has at least two flaws. First, the language of the Plan does not support a belief that the Standard Option—allowing more out-of-network benefits—would come with lower out-of-pocket costs. (*See* OPM000105, 116–17.) Second, OPM's interpretation of the Plan is not contrary to the congressional directive in 5 U.S.C. § 8902(i) because, as OPM notes, there is no evidence that, in the aggregate, the rates charged are not reflective of the cost of the benefits provided. The plan allowance for out-of-network, non-emergency surgeries is an average of the cost of all outpatient surgical services.

**The Decision was Supported by Reasons**

Plaintiff alleges that BCBS failed to provide the "mandated specific and detailed reasons" for the denial of plaintiff's claim, and that OPM erroneously affirmed that decision. OPM's notification to plaintiff contains the reason why, based on its review, it could not direct the Plan to provide additional benefits for this claim:

> Our review of the claim revealed the Plan processed the claim correctly. As indicated on page 67 of the 2008 brochure, under Outpatient Hospital Benefits or Ambulatory Surgical Centers, when a Non-member facility is used the member pays 30 percent of the Plan allowance, plus any difference between the Plan's allowance and the billed amount. The Non-participating allowance is defined on page 119 in the 2008 brochure. For outpatient, non-emergency surgical services at hospitals and other facilities that do not contract with the local BCBS Plan ("Non-member facilities"), the allowance is the average amount for outpatient surgical services that they pay nationally to contracting and non-contracting facilities. The Plan provided benefits at 70 percent of $2,300.00, the Non-participating provider allowance for the surgical services, Mr. Walters owes 30 percent of the Non-participating provider allowance plus the difference between the Plan allowance and the billed amount . . . .

(OPM00094.) The notification contained a chart setting out payment information for the billing

-13-

codes used by plaintiff for Mr. Walters' procedure. The court has already upheld OPM's interpretation of the Plan: that the plan allowance represents the national average paid for all outpatient surgical services rather than the national average for gastric-banding procedures. The court finds that OPM's decision contains the reasons that it upheld BCBS's payment of benefits. And the court finds that the reasons contained in the record are sufficiently specific and detailed to satisfy defendant's obligation under 5 C.F.R. § 890.105(d).

**Record was Sufficient to Support Decision**

Plaintiff argues that OPM made its decision based on an uninformed record, that is, a record that lacked, *inter alia*, the plan allowance calculation. The court understands plaintiff's argument to challenge defendant's failure to address or explain how the Plan arrived at the amount of $2,300 as the plan allowance. Defendant is not required to exhaustively explain its decision if the reason for the final action taken is given in the final decision. *See Camp*, 411 U.S. at 143; *Bowman Transp. Inc. v. Ark. Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). Again, the court has already upheld OPM's interpretation of the Plan: that the plan allowance represents the national average paid for all outpatient surgical services rather than the national average for gastric-banding procedures. The wisdom of such a provision is not an issue before the court in this appeal against this defendant. Nor is the reliability of the data used in reaching the plan allowance figure. Before the court is whether OPM's decision affirming the denial of benefits, based on its interpretation of the plan, was arbitrary or capricious. The court concludes that it was not arbitrary or capricious, and the court will not set aside OPM's decision because the Plan did not contain national data or a specific formula for how it or BCBSA calculated $2,300 to be the national average for all outpatient surgical services provided at contracting and non-contracting facilities.

**Conclusion**

OPM acted within the scope of its authority when it determined that the formula for calculating plaintiff's claim properly included all outpatient surgeries and not only those of the patient's type. The FEHBA specifically authorizes OPM to review and finally decide disputed claims involving claimants and carriers. It is for OPM to decide the benefits and exclusions it considers "necessary or desirable," 5 U.S.C. § 8902(d), and a carrier must pay a benefit claim if OPM finds that the contract terms entitle an individual to receive a payment, 5 U.S.C. § 8902(j). Pursuant to authority in 5 U.S.C. § 8913(a), OPM has established a mandatory administrative process for review of denied claims. 5 C.F.R. § 890.l05. OPM's interpretation of the Plan to include all outpatient claims and not only those of plaintiff's type was rational and was based on the published 2008 Plan brochure. The court finds that the language of the Plan provided a rational basis for the decision, and that the decision was reasonable and is supported by substantial evidence. The court therefore affirms the decision.

The court acknowledges that its ruling leads to a harsh result. The court is not insensitive to plaintiff's—and Mr. Walters'—situation. Mr. Walters elected to undergo a non-emergency surgical procedure, and he chose a provider that was outside of the BCBS network of covered providers. Out-of-pocket costs were foreseeable. And there is no reason for the court to believe that the plan allowance figure ($2,300) for such a procedure was not discoverable in advance. For the reasons set forth above, the upholding of OPM's decision is the correct result in this case.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Strike Exhibits with Memorandum in Support Included (Doc. 26) is granted.

**IT IS FURTHER ORDERED** that the decision of defendant OPM is affirmed, and judgment is entered in favor of defendant and against plaintiff.

Dated this 3rd day of August 2010, at Kansas City, Kansas.

**s/ Carlos Murguia**
**CARLOS MURGUIA**
**United States District Judge**
